# In the United States Court of Federal Claims

No. 16-950C, 17-2017C, 18-80C, 18-522C, 18-677C, 18-691C, 18-921C
(consolidated)

(Filed: July 30, 2018)[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| | * | |
| CB&I AREVA MOX SERVICES, LLC, | * | |
| | * | US/Russia Plutonium Management and |
| Plaintiff, | * | Disposition Agreement; National Nuclear |
| | * | Security Administration; Cost-Plus-Fee |
| v. | * | Construction Contract; Rules 12 and 56 |
| | * | Cross-Motions; Availability of Declaratory |
| THE UNITED STATES, | * | Relief; Government Claim Under Contract |
| | * | Disputes Act; Statute of Limitations. |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Mark J. Linderman*, with whom were *Dennis J. Callahan* and *Stephen L. Bacon*, Rogers Joseph O'Donnell, PC, San Francisco, California for Plaintiff.

*Joseph E. Ashman*, Senior Trial Counsel, with whom were *P. Davis Oliver* and *Anthony Schiavetti*, Trial Attorneys, and *Chad A. Readler*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Allison Kidd-Miller*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C. for Defendant.

## AMENDED OPINION AND ORDER

WHEELER, Judge.

Plaintiff CB&I AREVA MOX Services, LLC ("MOX Services") commenced this action on August 5, 2016. The action arises from MOX Services' cost reimbursement contract with the Department of Energy, National Nuclear Security Administration ("NNSA") to construct a Mixed Oxide Fuel Fabrication Facility at the Department of Energy's Savannah River Site, near Aiken, South Carolina. On November 3, 2017, with

---

[1] The Court issued this decision on June 11, 2018. On July 6, 2018, Defendant filed a motion for partial reconsideration concerning a portion of the decision. The Court granted this motion on July 30, 2018. Thus, the Court reissues the opinion, with relevant changes, in full.

the Court's approval, MOX Services filed a Supplemental Complaint for Damages and Declaratory Relief consisting of five counts: (1) Breach of Contract (Incentive Fee); (2) Declaratory Relief (Premature Claw Back of Provisional Incentive Fee); (3) Breach of Contract (Fixed Fee On Out-of-Scope Work and for the Realization of Risks NNSA Assumed); (4) Breach of Contract (Request for Equitable Adjustment Preparation Costs); and (5) Declaratory Relief (Request for Equitable Adjustment Preparation Costs).

This case, docket no. 16-950C, was the first in a series of actions that MOX Services filed under the same contract. The cases were filed separately in this Court because of individual claims that MOX Services had submitted to the contracting officer, and because of the NNSA's issuance of individual contracting officer final decisions. On May 15, 2018, the Court ordered the consolidation of these cases for further proceedings and trial.

The present controversy concerns cross-motions that the parties filed under Rules 12 and 56 of the Court. On December 27, 2017, MOX Services filed a motion for partial summary judgment regarding Counts II and V (the declaratory relief counts) of the Supplemental Complaint. MOX Services contends that Count II presents a pure question of contract interpretation on whether the NNSA prematurely clawed back $21.6 million of cost/schedule incentive fee payments it had made to MOX Services. Similarly, MOX Services contends that Count V presents a question of regulatory interpretation on whether the attorneys' fees and other professional consultant costs claimed by MOX Services for reimbursement as contract administration costs in investigating and preparing a Request for Equitable Adjustment ("REA") constitute "legal costs" that must comply with the requirements of 10 C.F.R. Part 719 (2013).[2]

On February 1, 2018, Defendant filed a motion for partial dismissal regarding Counts II, III, and V of the Supplemental Complaint. Defendant argues that Counts II and V should be dismissed for lack of jurisdiction because they were not presented to the contracting officer, they do not present a case or controversy and are not ripe, and because declaratory relief may not be granted when money damages are adequate. Defendant also moved for partial dismissal of Count III because MOX Services failed to provide required contractual notice of the claim, and because the claim allegedly is time barred by the Contract Disputes Act's six-year statute of limitations, 41 U.S.C. § 7103(a)(4) (2011).

On March 28, 2018, Defendant filed a response to MOX Services' motion for partial summary judgment, and purported to cross-move for partial summary judgment in its favor. However, as MOX Services notes, Defendant's "cross-motion" essentially was only a response, and not a cross-motion, to the arguments advanced by MOX Services. MOX

---

[2] 10 C.F.R. Part 719, entitled "Contractor Legal Management Requirements," calls for Department of Energy contractors to submit detailed information to the agency whenever a contractor retains a law firm or individual attorney as outside counsel. Payment of law firm invoices by the agency is subject to contractor compliance with these requirements.

Services, with some justification, objected to Defendant's filing of the final reply brief through the use of a "cross-motion."  The Court nevertheless has accepted all of the briefs submitted by the parties, concluding that Defendant did not obtain any advantage by filing the final brief.

The parties completed their briefing by April 25, 2018.  The Court heard oral argument on the motions on May 17, 2018.  For the reasons explained below, the Court GRANTS MOX Services' motion for partial summary judgment on Counts II and V, and DENIES Defendant's motion to dismiss Counts II, III, and V, and DENIES Defendant's cross-motion for partial summary judgment.

Factual Background[3]

On March 22, 1999, the NNSA awarded Contract No. DE-AC02-99CH10888 to MOX Services' predecessor in interest, Duke Cogema, Stone & Webster, LLC.  The Mixed Oxide Fuel Fabrication Facility ("MFFF") is intended to transform weapons-grade plutonium into mixed oxide fuel rods that may be used in commercial nuclear power plants.  The MFFF represents the United States' performance of its obligations under the Plutonium Management and Disposition Agreement ("PMDA") between the United States and Russia.  Under the PMDA, the United States and Russia agreed to dispose of 34 metric tons of weapons-grade plutonium roughly in parallel.

Construction of the MFFF is a considerable undertaking, and when built will constitute one of the largest and most complex fabrication facilities in the world. According to MOX Services, the main physical plant will require over 4.5 million cubic feet of concrete and 70 million pounds of reinforced steel.  The hundreds of process units and other equipment to be installed in the plant, many of which include conveyors and lifts and are sealed within hardened glove boxes, are being fabricated by specialty manufacturers in the United States and around the world at great expense.  The controls and utilities that join the building to the equipment will require, among other utility delivery channels, over 80 miles of piping, nearly 1,300 miles of cabling, and over 1.3 million pounds of HVAC ducts.  As a nuclear construction project where contractors will be working with weapons-grade plutonium and uranium oxide, the operations are governed by the regulations of the Nuclear Regulatory Commission.

The contract consists of a base contract for the design of the MFFF and three options: Option 1 is for construction of the MFFF (including fabrication and installation of

---

[3] The facts below are taken from MOX Services' Supplemental Complaint, and are assumed to be true for purposes of Defendant's motion for partial dismissal.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 572 (2007); Scheuer v. Rhodes, 416 U.S. 232, 236–37 (1974).  The Court also is satisfied that the declaratory relief counts of MOX Services' Supplemental Complaint (Counts II and V) present legal questions of contract and regulatory interpretation, and that no material fact issues exist.

process unit equipment and cold start-up); Option 2 is for the operation of the MFFF; and Option 3 ultimately is for the deactivation of the MFFF.

On May 20, 2008, MOX Services and the NNSA executed Modification 124 to the contract, which definitized the construction phase of the project (Option 1). The NNSA awarded Option 1 to MOX Services on a cost reimbursement basis, with MOX Services eligible to earn various types of fee or profit, including incentive fee. The contract includes the standard Federal Acquisition Regulation ("FAR") clause, FAR 52.243-2 (2007), Changes (Cost Reimbursement). This clause allows the NNSA's contracting officer to make changes within the scope of the project, and requires the contracting officer to make commensurate adjustments to the estimated costs and schedule, fee and other terms. The changes clause also applies to constructive changes performed by the contractor without a formal change order. In particular, the contract described certain risks that were not included in the original scope of work, for which the NNSA would be responsible if the risks materialized. The potential impacts of these risks were significant in terms of cost and schedule, but were difficult, if not impossible, to quantify.

The contract language describes the risks associated with uncertainties in the Congressional appropriations process. To effectively plan and manage a project of the size and scope of the MFFF requires sufficient, predictable, and reliable Congressional funding. The NNSA accepted risks related to the amount and timing of project funding, and agreed to process appropriate changes to the contract if this risk materialized.

As noted, the 1998 PMDA that gave rise to the MFFF project requires the plutonium disposition efforts of the United States and Russia to proceed roughly in parallel with each other. Because the risks associated with implementing the parallelism requirement were not quantifiable and were beyond MOX Services' control, the contract specifically and broadly excluded risks "related to" the Russian parallelism requirement from its scope. Since the NNSA accepted these risks, they were beyond the scope of the contract, and their potential impacts on the project were not included in the MFFF cost or schedule estimates.

The Russian program has lagged behind that of the United States, with the parallelism requirement exerting a drag on MFFF progress. Russia was slow to settle on the MFFF methodology to meet its plutonium disposition obligations. Once Russia determined that it would rely on versions of the same technology MOX Services planned

4

to deploy on the U.S. MFFF, it took years to work out and ratify a liability protocol under which Russia would use the technology.

The cost and schedule of the MFFF has escalated dramatically. Originally, the estimated cost was less than $4 billion, and the completion date was targeted for 2016. At present, the estimated cost is $9.9 billion, and the estimated completion date is in 2029.

A. Incentive Fee Facts (Count II)

Under Option 1 of the contract, beginning in the first quarter of fiscal year 2008, MOX Services was eligible to earn quarterly incentive fees for making progress toward completing MFFF construction within certain cost and schedule parameters. The contract's "Project/Cost Incentive Fee Band & Schedule" includes a "6.75% Fee Schedule" and a "7% Fee Schedule." The "7% Fee Schedule" became effective upon the execution of a contract modification for a "hot start" of the project. MOX Services asserts that the NNSA wrongly has refused to execute a "hot start" modification to avoid paying the higher fee, and thus contends that it is entitled to use the 7% Fee Schedule. MOX Services' certified claim to the contracting officer uses the 7% Fee Schedule, but for purposes of its motion for partial summary judgment, MOX Services uses the 6.75% Fee Schedule.

The incentive fee provisions also include a vesting schedule. For at least the first year after MOX Services invoices for quarterly incentive fees, the entire incentive fee is provisional. For as long as MOX Services' performance has remained within the cost and schedule parameters during the previous four quarters, 50% of the provisional incentive fee payment becomes final, and cannot be reclassified or taken back by NNSA. The other half of each quarter's incentive fee remains provisional.

The NNSA paid MOX Services for 12 quarterly incentive fee payments for fiscal years 2008 through 2010. Thereafter, NNSA determined that MOX Services was no longer within the applicable cost and schedule parameters. The NNSA suspended further incentive fee payments in February 2011. In total, the NNSA paid MOX Services $29.1 million, of which $21.6 million is provisional. The breakdown of NNSA's incentive fee payments to MOX Services is as follows:

| Period Earned | Quarterly Incentive Amount Available | Provisional Percentage | Provisional Value | Vested Value |
|---|---|---|---|---|
| 2008, Q1 | $750,000 | 50% | $375,000 | $375,000 |
| 2008, Q2 | $750,000 | 50% | $375,000 | $375,000 |
| 2008, Q3 | $750,000 | 50% | $375,000 | $375,000 |
| 2008, Q4 | $750,000 | 50% | $375,000 | $375,000 |
| 2009, Q1 | $3,000,000 | 50% | $1,500,000 | $1,500,000 |
| 2009, Q2 | $3,000,000 | 50% | $1,500,000 | $1,500,000 |

| 2009, Q3 | $3,000,000 | 50% | $1,500,000 | $1,500,000 |
| 2009, Q4 | $3,000,000 | 50% | $1,500,000 | $1,500,000 |
| 2010, Q1 | $3,525,000 | 100% | $3,525,000 | -0- |
| 2010, Q2 | $3,525,000 | 100% | $3,525,000 | -0- |
| 2010, Q3 | $3,525,000 | 100% | $3,525,000 | -0- |
| 2010, Q4 | $3,525,000 | 100% | $3,525,000 | -0- |
| **Totals** | **$29,100,000** | | **$21,600,000** | **$7,500,000** |

On September 29, 2016,[4] MOX Services submitted a certified claim to NNSA for approximately $53 million in suspended incentive fee, representing the incentive fee amounts from fiscal years 2011 to 2015 that NNSA has not paid.  In responding to the certified claim on December 7, 2016, the contracting officer issued two final decisions in a single letter.  Not only did the contracting officer deny the certified claim for $53 million, but he demanded MOX Services to refund all of the provisional incentive fee payments previously made.  As relevant here, the contracting officer directed MOX Services to return $21.6 million in provisional incentive fee in MOX Services' possession.  Through a combination of direct payments and reduced NNSA payments of MOX Services' invoices, MOX Services has satisfied NNSA's demand for repayment of the provisional incentive fee plus interest.

B. REA Facts (Count V)

In June 2015, MOX Services submitted Request for Equitable Adjustment 15-001, "Cost/Schedule Incentive Fee Payment," to NNSA.  MOX Services asserted in the REA that MOX Services was entitled to cost and schedule adjustments to bring MOX Services' performance within the parameters for the award of suspended incentive fee.  Later in 2015, MOX Services informed NNSA that it had expended over $2 million for outside counsel and accounting consultants to assist in investigating and preparing the REA.  MOX Services notified NNSA that it would seek reimbursement of these REA preparation costs. The parties disagreed on whether the REA preparation costs would be allowable as contract administration expenses.

On August 17, 2015, the parties agreed that MOX Services would submit a separate invoice for the REA preparation costs in order to isolate these costs from other MOX Services' costs.  MOX Services submitted Voucher 202C in the amount of $2,244,972 for reimbursement of professional costs incurred in the preparation of the REA.

The NNSA refused to pay Voucher 202C.  On February 15, 2016, MOX Services submitted a certified claim to NNSA for $2,244,972.  On May 11, 2016, the contracting officer issued a final decision denying the certified claim.  Among other reasons for

---

[4]  Some of these events have transpired since the original filing of the lawsuit, but were later included in Plaintiff's November 3, 2017 Supplemental Complaint for Damages and Declaratory Relief.

denying the claim, the contracting officer maintained that the REA preparation costs are unallowable because MOX Services had failed to comply with 10 C.F.R. Part 719. In particular, the contracting officer contended that MOX Services failed to comply with 10 C.F.R. § 719.20 (2013), which required MOX Services to submit a copy of its engagement letter with outside counsel, and with 10 C.F.R. §§ 719.40 and 719.44(a) (2013), which require compliance with 10 C.F.R. Part 719 in order for legal counsel and consulting costs to be allowable.

<u>Jurisdiction and Standard of Review</u>

Rule 56(a) of the Court permits a motion for summary judgment on all or part of a claim or defense. The summary judgment process is designed to avoid trial where there are no genuine issues of material fact. <u>See</u>, <u>e.g.</u>, <u>Cont'l Can Co. v. Monsanto Co.</u>, 948 F.2d 1264, 1265 (Fed. Cir. 1991). The moving party has the initial burden of showing an absence of genuine issues of material fact, and that the facts entitle it to judgment as a matter of law. RCFC 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

The Court has jurisdiction under the Tucker Act "to grant nonmonetary relief in connection with contractor claims, including claims requesting an interpretation of contract terms." <u>Alliant Techsystems, Inc. v. United States</u>, 178 F.3d 1260, 1270 (Fed. Cir. 1999). The Tucker Act itself provides that:

> The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, *and other nonmonetary disputes on which a decision of the contracting officer has been issued* under section 6 of that Act.

28 U.S.C. § 1491(a)(2) (2011) (emphasis added). In addition, a "claim" under the FAR "means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, *the adjustment or interpretation of contract terms*, or other relief arising under or relating to [the] contract." FAR 52.233-1(c) (2014) (emphasis added).

During contract performance, the Court has broad discretion to grant declaratory relief if the claim presents "a fundamental question of contract interpretation or a special need for early resolution of a legal issue." <u>Alliant Techsystems</u>, 178 F.3d at 1271. When deciding whether it is appropriate to grant declaratory relief, the Court should consider "whether the claim involves a live dispute between the parties, whether a declaration will resolve the dispute, and whether the legal remedies available to the parties would be

adequate to protect the parties' interests." Id. Moreover, the contractor is not required to wait until performance is completed before asserting a contract interpretation claim. Id. at 1266 ("The point is simply that the disputes clause does not impose an additional obligation to wait until performance is completed before filing a claim for relief from the contracting officer's decision.")

With regard to Defendant's motion for partial dismissal, a challenge to the "court's general power to adjudicate in specific areas of substantive law . . . is properly raised by a 12(b)(1) motion." Palmer v. United States, 168 F.3d 1310, 1313 (Fed. Cir. 1999). In determining whether it has subject matter jurisdiction to entertain a plaintiff's complaint, the Court should presume all factual allegations to be true and construe all reasonable inferences in favor of the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236-37 (1974). However, if the Court's jurisdiction is challenged, a plaintiff cannot rely merely upon the allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. See McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936). The plaintiff bears the burden of establishing the Court's jurisdiction by a preponderance of the evidence. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).

When considering a motion to dismiss a complaint for failure to state a claim upon which relief may be granted under Rule 12(b)(6), the Court must accept as true all factual allegations submitted by the plaintiff. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Accepting those allegations as true, for the plaintiff to survive dismissal, the Court must conclude that "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). The plaintiff's factual allegations must be substantial enough to raise the right to relief above the speculative level, accepting all factual allegations in the complaint as true and indulging all reasonable inferences in favor of the non-movant. Twombly, 550 U.S. at 545; Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed. Cir. 2008). In the government contracts context, the plaintiff must "provide sufficient factual allegations in the complaint to support success on the type of contract claim alleged in the complaint." Extreme Coatings, Inc. v. United States, 109 Fed. Cl. 450, 455 (2013).

Discussion

A. MOX Services' Motion for Partial Summary Judgment

    1. Provisional Incentive Fees (Count II)

The incentive fee issue presented in the cross-motions is whether MOX Services is entitled to retain provisional incentive fee payments until the construction of the MFFF is completed, or whether the NNSA is entitled to demand return of the provisional incentive

fee payments before construction is completed. The parties agree that the amount in dispute is $21.6 million.

The interpretation of a contract is a legal question that is subject to resolution by summary judgment. Forman v. United States, 329 F.3d 837, 841 (Fed. Cir. 2003). "A contract is read in accordance with its express terms and the plain meaning thereof." C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed. Cir. 1993). Provisions that are clear and unambiguous must be given their plain and ordinary meaning. Alaska Lumber & Pulp Co. v. Madigan, 2 F.3d 389, 392 (Fed. Cir. 1993). A contract is ambiguous only where its terms are amenable to more than one reasonable interpretation. Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 997 (Fed. Cir. 1996).

Here, the contract provisions taken together unambiguously provide that the incentive fee NNSA pays to MOX Services is to remain in the custody of MOX Services until the MFFF construction is completed. The provisional incentive fees are used explicitly to adjust cost sharing between the parties when construction is finished. Only at project completion does any unvested incentive fee become subject to potential payback to NNSA. An understanding of all the pertinent contract provisions yields this result.

Section B, Contract Line Items ("CLINs") 0001 through 0006, established the estimated cost reimbursement amounts for the construction of the MFFF. The total estimated cost in Section B.2 is $4,560,353,510, exclusive of fee. The total estimated fee in CLIN 0007 is $268,082,369. By adding these two amounts together, the total estimated price for the MFFF, cost plus fee, is $4,828,435,879. The fee in CLIN 0007 is broken down among fixed fee ($77,599,035), incentive fee ($148,055,406), and award fee ($42,427,928). Of the $148,055,406 in incentive fees, the incentive fee pool for the Option 1 MFFF is $76,862,871. This amount represents the incentive fee that MOX Services could receive by staying within the cost and schedule parameters of CLIN 0002. Pl.'s Mot. for Partial Summ. J., App., APPX004, Dec. 27, 2017.

Section J, Attachment 7, provides for a sharing of cost savings, or cost overruns as the case may be, at the time of project completion. Id. at APPX023. If the final project costs are less than the adjusted Total Project Cost ("TPC"), the contractor earns 25 cents for every dollar under the adjusted TPC. Section J.7, paragraph C, "Collateral Savings/Cost Share," provides "The Contractor's share of savings under this Paragraph is capped at $200,000,000, which is in addition to fees calculated under Paragraphs A and B above. Cost overrun remittance *is capped at remaining provisional fee*, as computed per Paragraph A above." Id. at APPX025 (emphasis added). Paragraph A, "Final Cost/Schedule Incentive Fee Payment Determination," states "At project completion, defined as the submittal and acceptance of the CD-4 [contract completion] package, *all provisional payments convert to final payments* provided the project cost at completion is less than or equal to the Adjusted TPC." Id. (emphasis added).

Additional incentive fee provisions are contained in Section B.3(b)(1), "Cost/Schedule Incentive Fee," and Section J, Attachment 7, "Cost/Schedule Incentive Fee Plan."

Section B.3(b)(1)(iv) states in pertinent part:

> (iv) Cost/Schedule Incentive Fee payments to the Contractor shall be 100% provisional for the 12 months following the period in which it is earned.  At the end of the fifth quarter following the quarter the incentive fee is earned, 50% of the Interim Incentive Fee payments received by the Contractor will become permanent provided the Contractor's performance is still within established parameters.  This process will continue each quarter of Option 1 performance.  If at any time the Contractor is not performing within the cost and schedule parameters established per Incentive/Milestone Fee Plan, paragraph 2.A, payments of that incentive fee shall stop and all such incentive fee that is provisional shall remain provisional until the Contractor's performance improves to once again fall within established cost and schedule parameters established per Incentive /Milestone Fee Plan.

Id. at APPX007.  Section J.7, "Final Incentive Fee Payment," states:

> The final incentive fee determination will be calculated by the [contracting officer] subsequent to the end of the final evaluation period, i.e., September 2016 (if that date is not extended).  The final incentive fee determination will be based on the total allowable, final project costs for the physical completion and acceptance of the MFFF the work scope defined by CLIN 0002.  The costs shall be calculated using the Contractor's approved Earned Value Management System and the results of any Government audits.

> The final incentive fee payment will be based upon overall progress and will reflect the difference between the final incentive fee determination and the sum of quarterly provisional incentive fee payments made during the period of the contract, subject to the maximum fee amounts in Section B and this plan.  If the sum of quarterly provisional incentive fee payments made during the period of the contract is greater than the overall fee that is calculated by the [contracting officer] in his/her final incentive fee determination, the contractor shall

reimburse the amount of fee already paid that is greater than the amount of fee earned.

The final incentive fee payment shall be limited by the Maximum amount of Fee available in Section B, subject to the contractor's achievement of the minimum performance requirements and threshold requirements of this plan.

APPX026-027.

The NNSA's attempt to claw back $21.6 million in provisional incentive fees is premised on the assertion that MOX Services has hopelessly exceeded the estimated project cost, has no chance of meeting the project schedule parameter, and thus will not be able to show entitlement to any incentive fees at project completion.  In opposition, MOX Services maintains that the estimated project cost and schedule must be adjusted under the changes clause, FAR 52.243-2, because MOX Services is not responsible for the increased costs and schedule delays incurred to date.  These contentions present factual issues that will be resolved in the other claims that MOX Services has submitted to the Court.  It remains to be seen whether the estimated cost and schedule will require adjustment.

Regardless of which party is responsible for the increased costs and schedule delays, none of the contract provisions permits the NNSA to claw back provisional incentive fees before the completion of the MFFF.  The Court in effect is granting declaratory relief requiring the NNSA to return $21.6 million to MOX Services until the MFFF project is completed.  MOX Services may submit an invoice to the NNSA for this amount attaching a copy of this decision.

## 2. REA Preparation Expenses (Count V)

At the May 17, 2018 oral argument, Defendant's counsel conceded that 10 C.F.R. Part 719 does not apply to MOX Services, and cannot be relied upon as a basis to oppose MOX Services' claims for REA preparation expenses.  Oral Arg., Tr. 29, May 17, 2018 ("[W]e are not contesting the issue of the applicability of 10 CFR 719.")  Accordingly, the Court grants declaratory relief in favor of MOX Services on this contract interpretation issue.

## B. Defendant's Motion for Partial Dismissal

In its February 1, 2018 motion for partial dismissal, Defendant asserts that Counts II, III, and V of MOX Services' Supplemental Complaint should be dismissed for failure to state a claim upon which relief may be granted under Rule 12(b)(6), and for lack of subject matter jurisdiction under Rule 12(b)(1).  With regard to Count III, Defendant argues: (1) that the claim is not based upon any contractual provision; and (2) that MOX

Services failed to submit the claim to the contracting officer within six years of accrual. With regard to Counts II and V, Defendant contends that: (1) the contract interpretation claims were not presented to the contracting officer; (2) the Court lacks jurisdiction because they do not present a case or controversy, and are not ripe; and (3) declaratory relief is not appropriate where money damages are adequate.

    1.  Count III (Breach of Contract)

The Government's alleged infirmities regarding Count III are without merit.  The suggestion that MOX Services' breach of contract claim is not based upon a specific contract provision is simply wrong.  As MOX Services points out, the NNSA was obligated to increase the congressional baseline for the MFFF project and to issue a corresponding modification to the contract to account for "fee bearing" changes and certain "outside of the project risks" that were expressly assumed by NNSA.  MOX Services asserts that the NNSA has failed to fulfill these obligations.

The thrust of Defendant's argument seems to be that Count III is styled as a breach of contract claim rather than an equitable adjustment claim, but this is a semantic distinction without a substantive difference.  See Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1577 (Fed. Cir. 1995) (equating an REA with the assertion of a breach of contract claim) (citing Crown Coat Front Co. v. United States, 386 U.S. 503, 511 (1967) ("With respect to claims arising under the typical government contract, the contractor has agreed in effect to convert what otherwise might be claims for breach of contract into claims for equitable adjustment.")).  This Court has rejected similar attempts by the Government to dismiss causes of action by elevating form over substance.  See, e.g., M.A. DeAtley Constr., Inc. v. United States, 71 Fed. Cl. 370, 377 (2006) (noting that "the court is not inclined to dismiss a cognizable claim based solely on an improper label where the substance is correct" and that "is especially so where, as here, the substance of the claim is so readily identifiable that Defendant could discern Plaintiff's intent").  Here, MOX Services has based its claim for fixed fee on both the changes clause and other risk-shifting provisions that have been disregarded by the NNSA.  There is no question that MOX Services followed the procedures of the Contract Disputes Act by submitting the REA and then a certified claim for fixed fee, putting all of these issues squarely before the contracting officer for a decision.

Defendant contends that MOX Services cannot state a claim under the changes clause because it did not comply with the requirement under FAR § 52.243-2(c) (2007) to assert a right to an equitable adjustment within 30 days of receiving a written change order. This argument might apply if any change orders existed here, but they do not.  If there were no change orders, notice did not need to be submitted within the 30-day period.  Jo-Bar Mfg. Corp. v. United States, 210 Ct. Cl. 149, 156 (1976) (holding that "[i]n the constructive

change situation, notice of the claim need not be presented 'within the specific number of days allowed' by the Changes clause") (citations omitted).

Defendant's position reflects a "severe and narrow application of the notice requirements" which has often been rejected. See, e.g., Hoel-Steffen Constr. Co. v. United States, 197 Ct. Cl. 561, 573 (1972) (stating that notice provisions should be applied liberally where the government is aware of the relevant facts). Even if some notice requirement applied here, MOX Services' claim is not precluded because Defendant knew all of the operative facts giving rise to the claims. Nova Grp./Tutor-Saliba v. United States, 125 Fed. Cl. 469, 474 (2016) (noting that "the Government's actual or imputed notice of circumstances giving rise to the claim have 'weighed against strict enforcement of the time limit'") (citations omitted). Even if any doubt exists on this issue, the question can only be decided on the basis of a fully developed factual record.

It is also well settled that the Contract Disputes Act's six-year statute of limitations is an affirmative defense that does not relate to this Court's jurisdiction to hear a matter. Sikorsky Aircraft Corp. v. United States, 773 F.3d 1315, 1320–22 (Fed. Cir. 2014). The Government has the burden of proving this defense. See Shell Oil Co. v. United States, 751 F.3d 1282, 1297 (Fed. Cir. 2014). Further, the Federal Circuit has recognized that "[d]ismissal at the pleading stage on statute-of-limitations grounds ordinarily is improper unless it is 'apparent from the face of the complaint that the claim is time-barred.'" ABB Turbo Sys. AG v. TurboUSA, Inc., 774 F.3d 979, 985 (Fed. Cir. 2014) (citations omitted).

The question of "whether and when a CDA claim accrued is determined in accordance with the FAR, the conditions of the contract, and the facts of the particular case." Kellogg Brown & Root Servs. v. Murphy, 823 F.3d 622, 626 (Fed. Cir. 2016); see also Parsons Global Servs. v. McHugh, 677 F.3d 1166, 1170 (Fed. Cir. 2012). Here, Option 1 obligated the NNSA to increase the congressional baseline for the MFFF Project and to execute a corresponding modification to the contract's Total Project Cost to account for "fee-bearing" changes and certain "outside of the project risks" that were assumed by NNSA. According to MOX Services, "fee-bearing" changes and materialized risks have occurred, but NNSA has failed to process a baseline change to add fee to the contract. Thus, MOX Services' claim did not "accrue" until it reasonably should have known that NNSA would refuse to re-baseline the project as it promised to do. See Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874, 878 (Fed. Cir. 1998) ("[A] breach of contract claim accrued when [the plaintiff] should have known that it had been damaged by the government's breach.")

The congressional re-baselining process is a mandatory pre-claim procedure identified in the contract as the mechanism to adjust the fee to account for "fee-bearing" scope changes and "outside of the project risks" that materialized. Defendant does not mention that process and wrongly presumes that MOX Services should have claimed fee on out-of-scope work before NNSA even authorized a re-baselining effort and before MOX

Services submitted its re-baselining proposal.  As the Federal Circuit recently observed, "precedent illustrates that the limitations period does not begin to run if a claim cannot be filed because mandatory pre-claim procedures have not been completed."  Murphy, 823 F.3d at 628; see also Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp., 522 U.S. 192, 200 (1997) (holding under "basic limitations principles" that the statute of limitations cannot begin until such time as the claimant is legally eligible to bring the claim).  Here, the re-baselining proposal in late 2012 was just the first step towards completion of the mandatory pre-claim procedure envisioned by the parties to address fee on out-of-scope work.

MOX Services could not have known of the breach – and its claim did not accrue – until it knew or should have known that the NNSA would not process a baseline change to add fee to the contract.  The NNSA did not even direct MOX Services to start the re-baseline process until January 2012 – well within the six-year statute of limitations.

### 2.  Counts II and V (Declaratory Relief)

Count II is an affirmative government claim in which the NNSA clawed back $21.6 million in provisional incentive fee payments previously made to MOX Services.  MOX Services did not present a certified claim to the contracting officer for this amount.  However, the $21.6 million claw back amount is an affirmative *government* claim, and does not require a presentment to the contracting officer.  Total Eng'g, Inc. v. United States, 120 Fed. Cl. 10, 15 (2015) ("The CDA does not require the contractor to jump through such an extra hoop and refile its defense to a Government claim as a so-called contractor's 'claim' where it is not seeking any separate monetary relief or contract adjustment."); see Placeway Constr. Corp. v. United States, 920 F.2d 903, 907 (Fed. Cir. 1990) (holding that under a letter from the contracting officer to the contractor, "[a]s a final decision on a government claim, the Claims Court has jurisdiction, even though the claim was not certified"); HNV Cent. River Front Corp. v. United States, 25 Cl. Ct. 606, 610 (1992) ("There is no statutory requirement to certify government claims, and the United States Claims Court has jurisdiction provided that the contracting officer's decision is final.")

Defendant's resort to M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327 (Fed. Cir. 2010), is unavailing.  Maropakis does not apply where, as here, the contractor is not seeking an adjustment to contract terms.  See Total Eng'g, 120 Fed. Cl. at 15 (denying the Government's jurisdictional argument because, "[u]nlike the contractor in Maropakis, [the plaintiff was] not seeking an adjustment of contract terms, but [was] simply defending against a Government claim").

The letter denying MOX Services' certified claim for incentive fee states in the subject line that it is in part a "Demand for Repayment of Unearned Provisional Incentive Fee – Contracting Officer's Final Decision."  Partial Summ. J., App., APPX033.  The final decision states:  "NNSA hereby determines that MOX Services is not entitled to unearned

Incentive Fee previously paid to MOX Services on a provisional basis in the amount of $21,600,000." Id. at APPX035. The final decision further states that "[t]he provisional amount… must be returned to the Government." Id. at APPX038. The letter described the appeals process that MOX Services could employ for challenging the final decision. Id. at APPX040–041. There is no question that MOX Services has the right to appeal the Government's affirmative claim.

The Court rejects out of hand Defendant's ripeness argument that there is no case or controversy presented in Count II. As addressed earlier in this opinion, MOX Services has claimed that the NNSA clawed back $21.6 million to which it had no right, if at all, until the completion of the Option 1 MFFF Project. Declaratory relief is appropriate here to resolve a ripe dispute on whether the contract can be interpreted to support the NNSA's claw back of the provisional incentive fee in question.

Count V is resolved by again citing the concession of Government counsel during the May 17, 2018 oral argument that "we are not contesting the issue of the applicability of 10 CFR 719." Oral Arg., Tr. 29, May 17, 2018. Defendant no longer contends that it has a basis for dismissal of Count V.

Conclusion

For the foregoing reasons, Plaintiff's motion for partial summary judgment is GRANTED, and Defendant's motion for partial dismissal is DENIED. Defendant's cross-motion for summary judgment also is DENIED.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge